UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                               Case No. 23-CR-14

WILLIE VALES, et al.,

          Defendants.

## ORDERS AND RECOMMENDATION

Willie Vales is charged with various drug and firearms related offenses. (ECF No. 28.) He seeks to suppress evidence seized from his apartment and certain statements he made following his arrest. (ECF No. 92.)

**1. Vales's Motions to Seal**

Before addressing the substance of his motion, the court must address the fact that Vales filed everything under seal. This included his one-page motion (ECF No. 92), his brief in support (ECF No. 93), two investigative reports (ECF Nos. 93-1; 93-2), a copy of Wisconsin Act 79 (2013) (ECF No. 93-3), his reply brief (ECF No. 104), and a printout from the Wisconsin Circuit Court Access Program's website (ECF No. 104-1).

The court struck Vales's initial filings because he failed to comply with Gen. L.R. 79(d), but when his resubmission was substantively identical, for the sake of expediency the court granted the motion but intended to address the matter more substantively later. Vales has now filed a motion to seal his reply brief and again failed to comply with Gen. L.R. 79(d). (ECF No. 103.)

In his initial motion to seal and his current motion to seal his reply brief Vales points to the fact that the court issued a protective order that states, "'Copies of the discovery materials filed with the court must be filed under seal to retain the confidential nature of the materials unless consent to filing in the public record is obtained from an attorney for the government.' (Doc. 36)." (ECF No. 103 at 1.)

As to his brief, he explained that it contains "extensive reference to contents of the reports which is also governed by the protective order. It would be difficult, if not impossible, to understand the substantive arguments in the memorandum absent access to these reports. Therefore, they must, in addition to the motion and memorandum, be filed under seal." (ECF No. 91 at 1-2.) He concedes that the copy of Act 79 that he filed did not need to be sealed. Nonetheless, he filed it under seal.

Vales's motions reflect common misunderstandings of the court's Local Rules and all parties' obligations thereunder. The court will now attempt to correct these misunderstandings for the benefit of all future litigants.

First, as a basic premise, everything that happens in federal court is presumptively public. *See Nixon v. Warner Commc'ns*, 435 U.S. 589, 597 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents."); *Grove Fresh Distribs. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994); *United States v. Kalkounos*, No. 06-cr-102-pp, 2018 U.S. Dist. LEXIS 27591, at *2 (E.D. Wis. Feb. 21, 2018) (noting "the strong presumption of public access in criminal proceedings"); *cf. Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982) (discussing public access to criminal proceedings); *In re EyeCare Physicians of Am.*, 100 F.3d 514, 517 (7th Cir. 1996) (discussing right to access sealed documents related to a search warrant). "Public scrutiny over the court system serves to (1) promote community respect for the rule of law, (2) provide a check on the activities of judges and litigants, and (3) foster more accurate fact finding. *Grove Fresh*, 24 F.3d at 897 (citing *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555 (1980)). There needs to be a very good reason to keep *anything* from the public. The parties' agreement that the information is confidential is not a good reason. And when a good reason does exist for keeping something from the public, that restriction must be as narrow as possible. *See In re Krynicki*, 983 F.2d 74, 75 (7th Cir. 1992) (Easterbrook, J., chambers opinion).

Second, although it is common to refer to a document that is not available to the public through PACER as "sealed," there is a distinction between documents that are

"sealed" and those that are "restricted." *See* Gen. L.R. 79(d); ECF Policies and Procedures (E.D. Wis.), I. I. 2., https://www.wied.uscourts.gov/e-filing/ecf-policies-and-procedures#Privacy.

Documents that are "sealed" are unavailable to anyone except the court. If a party files a "sealed" document, the only way the other case participants can get access to the document is if the filer manually provides it to the other parties. The other parties will not have access to it through CM/ECF or PACER. Because of this level of restriction, the "sealed" designation is generally best reserved for documents that will not have to be provided to anyone other than the court, *e.g.*, *ex parte* requests for funding under the CJA or *ex parte* statements in support of a motion for a protective order.

Documents that are "restricted" are accessible to the court and case participants based on their CM/ECF credentials but not the public. This is the most-common designation for confidential documents filed in federal court. Attorneys must take care to use the proper designation when filing.

Third, the existence of a protective order is not by itself reason enough for the court to grant a motion to seal or restrict a document. A protective order may prohibit a party from simply publicly filing a document deemed confidential without taking any other steps, but the court's Local Rules dictate a party's obligations from there.

Fourth, a party often must file two versions of any document containing confidential information—(1) a public version that narrowly redacts only the

4

confidential information and (2) an unredacted sealed or restricted version. *See* Gen. L.R. 79(d)(2) ("To the extent possible, the movant should include with the public filing a version of the document or material that redacts only those portions of the document that are subject to the restriction/sealing request."). Thus, if a brief contains details that are truly confidential, the solution is not to file the entire brief under seal but instead to file both a public redacted version and an unredacted version that is sealed or restricted. An exception is when the confidential information is not relevant, *i.e.*, the court does not need to know the information to address the matter before it. In that case, it may be appropriate for the party to file only a redacted version and Gen. L.R. 79(d) would not apply.

Defense counsel must identify the specific confidential information in his brief and related filings. Then he must consult with the government about whether it believes that information needs to remain confidential. *See* Gen. L.R. 79(d)(4). The government then must confer with defense counsel to ensure that the restrictions are as narrow as possible. *See* Gen. L.R. 79(d)(4). This conference must occur before the defendant files anything; it is not appropriate for the government to state that it will wait and review the defendant's filing or to blindly assert that everything is confidential. Conversely, defense counsel does not comply with his obligation if he does not give the government sufficient time to conduct a meaningful review. There must be "a good faith attempt to

avoid the motion or to limit the scope of the documents or materials subject to sealing under the motion." Gen. L.R. 79(d)(4).

If the government asserts that a portion of the brief is confidential, defense counsel must then file two versions of his brief—a redacted version that is available to the public and an unredacted version that is either sealed or restricted. Only if the government asserts that the entire document is confidential would it be appropriate for a defendant to rely on a protective order to file a document entirely under seal.

In a motion to seal or restrict defense counsel must explain why the unredacted version is being filed under seal or restricted, certify that the parties have conferred in good faith, Gen. L.R. 79(d)(4), and state the defendant's position as to whether he "supports, objects to, or takes no position on the continued sealing of the documents or materials," Gen. L.R. 79(d)(3).

Vales has not complied with Gen. L.R. 79(d)(3) or (4) in either of his motions. Instead, as the basis for filing his materials under seal, he relies solely on the fact that a protective order is in place. He has offered no explanation as to why a public state court record (which presumably was not produced in discovery and thus is not subject to the protective order in the first place) should be sealed.

For its part, the government has not indicated whether it believes that Vales's briefs must be sealed, but it publicly filed its response (ECF No. 102) wherein it discusses much of the same information contained in Vales's motion, brief, and reply. It

also publicly filed numerous supporting documents, redacting only small (and apparently irrelevant) portions of those documents. (ECF Nos. 102-1 – 102-12.) Significantly, two of the documents the government filed (ECF Nos. 102-2 and 102-9) are identical to the investigative reports that Vales filed under seal (ECF Nos. 93-1 and 93-2). By filing them publicly, the government obviously believes that, notwithstanding the protective order, those documents do not need to be withheld from the public.

All of these efforts by defense counsel and the court could have been avoided had defense counsel complied with the court's Local Rules and conferred with counsel for the government before filing the present motion.

Vales's motion to seal his reply (ECF No. 103) will be denied. The court will also vacate its prior order (ECF No. 96) as it relates to Vales's motion to seal (ECF No. 91). All documents associated with docket numbers 92, 93 and 104 will be public. The court now turns to the substance of Vales's motion.

2. **Vales's Motion to Suppress**

    a. **Physical Evidence**

The government on January 4, 2023, obtained a criminal complaint charging Vales and others with various federal crimes related to the distribution of controlled substances from June 2021 to the present. (ECF No. 1.) Armed with an arrest warrant issued in conjunction with that complaint, federal agents went to Vales's apartment on the morning of January 11, 2023. When Vales answered the door, he was arrested.

Agents reentered the apartment with Vales and an agent asked if there were any guns or drugs in the apartment. Vales denied any drugs but stated that his girlfriend's gun was in the oven. He was not given his *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S. 436 (1966), before he disclosed the location of the gun.

Agents asked for Vales's consent to search the apartment. He consented but says that he did so because agents told him that, if he did not consent, they would obtain a search warrant. Agents also knew that he was under supervision by the Wisconsin Department of Corrections for a prior felony conviction. Under what is commonly referred to as Act 79, a law enforcement officer can search property controlled by a person under DOC supervision if "the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime or a violation of a condition of release to extended supervision." *United States v. Johnson*, No. 20-CR-214, 2021 U.S. Dist. LEXIS 56435, at *7 (E.D. Wis. Mar. 25, 2021) (quoting 2013 Wis. Act 79, § 5; Wis. Stat. § 302.113(7r)).

Vales spends much time discussing the propriety of law enforcement reentering the apartment once he was arrested, the scope of agents' protective sweep, whether suspected marijuana on a windowsill was in plain view, and whether his consent was voluntary. But these facts are all immaterial. The undisputed evidence readily establishes that agents lawfully searched his apartment under Act 79.

Vales's arguments ignore what brought agents to his apartment in the first place—a federal judge had issued a warrant for his arrest because she found probable cause that he had committed various federal crimes. A federal judge's finding that a person committed a crime is more than enough to lead a law enforcement officer to "reasonably suspect[] that the person … has committed a crime" under Act 79. There is no dispute that Vales was on extended supervision following his release from prison on November 26, 2019 (ECF No. 102-12 at 3), and he would remain on supervision until 2030 (ECF No. 102-12 at 1). It is also undisputed that the subject apartment was his residence. (ECF No. 93 at 1-2.) And there is no argument that law enforcement failed to comply with any of the other provisions of Act 79.

Act 79 is consistent with the Fourth Amendment. *United States v. Caya*, 956 F.3d 498, 501 (7th Cir. 2020) (discussing *Griffin v. Wisconsin*, 483 U.S. 868 (1987); *United States v. Knights*, 534 U.S. 112 (2001) *Samson v. California*, 547 U.S. 843 (2006)). Accordingly, the search of the apartment was lawful under Act 79, and the court will recommend that Vales's motion to suppress physical evidence seized during the search be denied.

### b. Statements

Vales also seeks to suppress "statements." Although he uses the plural throughout his motion, the court can identify only a single material statement that Vales says he made before being advised of his *Miranda* rights—that there was a gun in the oven.

*Miranda* applies if two conditions are met. First, the person must be in custody. *United States v. Cox*, 54 F.4th 502, 511 (7th Cir. 2022). Second, the person must be subject to interrogation. *Id*. It is undisputed that Vales was in custody, having been arrested pursuant to an arrest warrant. He was also subject to interrogation. Because agents knew that Vales was prohibited from possessing a firearm, asking him if there were any guns in his home was a question the agents should have known was "reasonably likely to elicit an incriminating response," *see Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

The government nonetheless argues that Vales's statement is admissible under the public safety exception to *Miranda*. *See New York v. Quarles*, 467 U.S. 649, 104 S. Ct. 2626, 81 L.Ed.2d 550 (1984). Under that exception officers are able to ask "questions necessary to secure their own safety or the safety of the public." *Id.* at 659. The public safety exception is assessed objectively. *United States v. Hernandez*, 751 F.3d 538, 542 (7th Cir. 2014) ("That the officers did not articulate these concerns is no matter; the public safety exception applies based on objective facts, not subjective motivations." (citing *Quarles*, 467 U.S. at 655–56, 104 S.Ct. 2626)).

According to a report authored by Task Force Officer Todd Higgins, after agents arrested Vales he asked why he was being arrested. (ECF No. 102-2 at 2.) Higgins explained that a federal warrant had been issued for his arrest regarding a drug conspiracy involving persons in Arizona. (ECF No. 102-2 at 2.) Higgins explained that they would like to talk to Vales about the investigation, to which Vales responded that

he was not involved in drugs. (ECF No. 102-2 at 2.) Higgins asked if Vales would allow them to search his apartment to confirm that there were no drugs there and, if no drugs were found, he would report that to the prosecutor. (ECF No. 102-2 at 2.) Vales denied there were any drugs in his home and consented to a search. (ECF No. 102-2 at 2.) Higgins then asked Vales if there were any guns in the apartment (ECF No. 102-10 at 2), to which Vales responded that there was a gun inside of the stove, placed there by his girlfriend, to whom the gun belonged (ECF Nos. 102-2 at 2; 102-10 at 2).

In a report written after Vales filed this motion, another officer wrote that Higgins asked Vales if there were any guns or drugs in the apartment "for safety so an officer searching knew where to expect drugs or a firearm to be located to ensure the safety and proper handling of said items by an officer." (ECF No. 102-10 at 2.)

In opposing Vales's motion, the government argues that "law enforcement could not have known whether other dangerous weapons or hazardous drugs were present in the apartment that could cause them harm if they happened upon them unexpectedly or mishandled them in some way." (ECF No. 102 at 23.) But it has not pointed to any case where a court has held that an officer's concern that he may mishandle a hidden firearm during a residential search supports the application of the public safety exception to a question of whether there are any guns in the home. The closest example the government provided is *United States v. Williams*, 181 F.3d 945 (8th Cir. 1999), in which the court held that the public safety exception applied when, just prior to starting

a search of the defendant's home, an officer asked, "is there anything we need to be aware of?" *Id* at 948. The defendant responded that there was a gun in the closet. *Id*.

The officer's question in *Williams*, however, was much broader than Higgins's questions about drugs and guns. In fact, it is doubtful that the question in *Williams* could be characterized as interrogation. The question was more likely to elicit a response like, "There's a pit bull in the bedroom," or, "The second stair to the basement is broken," as it was an incriminatory disclosure about the location of a gun. The court skipped over the preliminary question of whether *Miranda* applied before holding both that the public safety exception would apply and that, in any event, the admission was harmless. *Williams*, 181 F.3d at 954; *see also United States v. Luker*, 395 F.3d 830, 832, 833-34 (8th Cir. 2005) (finding public safety exception applied to officer's question of whether there was anything in defendant's "vehicle that shouldn't be there or that they should know about"); *United States v. Liddell*, 517 F.3d 1007, 1008 (8th Cir. 2008) (finding the public safety exception applied to the question, asked before searching a car, "Is there anything else in there we need to know about?").

The only two other cases the government cites in support of its position are readily distinguishable. In *United States v. Edwards*, 885 F.2d 377, 384 (7th Cir. 1989), officers conducted a traffic stop following what they believed to be an exchange of one kilogram of cocaine, after which they handcuffed the occupants and then asked the driver if he had a gun. *United States v. Edwards*, 885 F.2d 377, 380 (7th Cir. 1989). He

"replied, 'What do I need a gun for,' and stated that he was just there to have dinner." *United States v. Edwards*, 885 F.2d 377, 380 (7th Cir. 1989). Although it is unclear how the response was incriminating or relevant, the court found the officer's question to be consistent with the public safety exception recognized in *Quarles*.

In *United States v. Are*, 590 F.3d 499 (7th Cir. 2009), the court of appeals relied on *Edwards* to conclude that the defendant's statement was properly admitted. Agents went to the defendant's home to execute an arrest warrant. The defendant was charged in a drug conspiracy and had several prior arrests for drug and weapons offenses. *United States v. Are*, 590 F.3d 499, 504 (7th Cir. 2009). Agents located the defendant in his home, handcuffed him, and took him to the living room where his wife and children were waiting. *United States v. Are*, 590 F.3d 499, 504 (7th Cir. 2009). An agent asked the defendant if there were any weapons in the home, and he responded that there was an AK-47 under the dresser in the bedroom. *United States v. Are*, 590 F.3d 499, 504 (7th Cir. 2009). Agents eventually found the rifle in a nearby closet. *United States v. Are*, 590 F.3d 499, 504 (7th Cir. 2009). The court explained:

> Though Daniels was cuffed and the officers and agents had conducted a brief protective sweep, they knew that Daniels was a drug dealer who was being arrested for drug conspiracy charges. They also knew that he had several prior drug and weapons offenses. But they did not know the location of any weapon that he may have had in the house. A weapon might have been hidden near the place where the officers placed Daniels before taking him outside and thus would have been within his reach. Or it could have been in an easily accessible location for Daniels to lunge for on his way out the door. Therefore, it was reasonable for the officers and

13
Case 2:23-cr-00014-BHL   Filed 01/23/24   Page 13 of 19   Document 105

agents to believe that Daniels might have a gun on the premises and to ask him whether he had any weapons in the house.

*United States v. Are*, 590 F.3d 499, 506 (7th Cir. 2009).

In both *Edwards* and *Are*, officers were concerned that the suspect or a confederate would obtain a weapon and use it against officers. The concern was not the one the government articulates here—that officers might injure themselves by mishandling a gun found during a search. (ECF Nos. 102 at 23 ("Similar to *Are* and *Williams*, here, law enforcement could not have known whether other dangerous weapons or hazardous drugs were present in the apartment that could cause them harm if they happened upon them unexpectedly or mishandled them in some way."); 102-10 at 2 ("This was asked of VALES for safety so an officer searching knew where to expect drugs or a firearm to be located to ensure the safety and proper handling of said items by an officer.").)

Insofar as the government may be arguing that officers reasonably feared that Vales or a confederate may use a hidden firearm against them, it has failed to sustain its burden. As is made clear by the photos submitted by the government (ECF Nos. 102-3, 102-4, 102-5), there was no reasonable prospect of an unseen confederate lurking in the tiny studio apartment. Vales's girlfriend had already been removed to the hall. (ECF No. 102-2.) And Vales was handcuffed and under law enforcement control. If there was a reasonable concern about Vales accessing a secreted firearm and using it against

officers, the government does not explain why officers would have chosen to have him remain in the apartment.

The court of appeals in *United States v. Hernandez*, 751 F.3d 538 (7th Cir. 2014), acknowledged that the public safety exception may be implicated in the sort of officer safety concern the government articulates here, *id*. at 541, but it did not substantively address the issue. Instead, it discussed a perceived variation among circuits between a broad and narrow approach to the public safety exception. It explained:

> These nuances among the circuits produce one common practical distinction. If there is a perceived risk that, when searching a vehicle or a residence, the officer might inadvertently bump or otherwise mishandle a hidden firearm (or other dangerous object) the broad approach would permit the officer to first ask whether any such danger is present. The narrow approach would not.

*Id.*

The court went on to note that in *Are* it approvingly cited the Eighth Circuit's broad approach (as reflected in *Liddell*) but continued, "we have not had to decide whether we agreed entirely, because in *Are* there was a risk of the suspect or others who were there obtaining any weapon that was hidden on the premises." *Hernandez*, 751 F.3d at 541.

Ultimately, *Hernandez* is analogous insofar as the court endorsed the application of the public safety exception to officers' questions about potential hazards they may encounter in a search. Specifically, the court noted that officers had found heroin, which

15

is often administered by syringes and, if those syringes were in the bag, they posed a risk of disease for the officers. *Hernandez*, 751 F.3d at 541-42.

Unlike *Hernandez*, where the presence of heroin alerted officers to a risk of syringes, Higgins had no specific reason to suspect that there might be guns in the apartment, much less guns stored unsafely so as to pose a special threat to officers. Even the general notion that guns often coincide with drug dealing was mitigated by the fact that Vales's role in the conspiracy was believed to be limited to financial crimes. And the presence of what appeared to be a trivial amount of marijuana would not suggest otherwise. Although Vales had been convicted of first-degree sexual assault while armed, that offense was years ago.

Firearms pose a narrow risk of accidental discharge to officers. After all, some legislatures have deemed firearms safe enough to be carried by adults in public without any licensing or training. This is not to say that there is no risk that an officer conducting a search may inadvertently mishandle a firearm, resulting in it firing, but the government has offered no hint as to the frequency of such an occurrence and thus the court cannot gauge the actual risk.

The fact that the government has failed to point to any case where a court endorsed this sort of expansive view of the public safety exception is telling given that the concern that officers may encounter a firearm would exist every time law enforcement searches a home. Applying the public safety exception here would

16

Case 2:23-cr-00014-BHL   Filed 01/23/24   Page 16 of 19   Document 105

seemingly amount to a categorical rule that, before searching a home, officers may ask an arrestee about the presence of guns and any inculpatory response may be used against him.

"This case does not raise the type of emergency, volatile situation that the public safety exception is designed to serve." *United States v. Lim*, 897 F.3d 673, 691 (5th Cir. 2018). Without specific reasons to believe that officers were likely to encounter firearms that may be retrieved and used against them or stored in a manner that posed an acute risk to officer safety during the search, an officer's question about the presence of firearms in a home does not fall under the public safety exception.

The court emphasizes that this conclusion does not curtail an officer's ability to ask an arrestee about hazards he might face in conducting a search. The officer may ask about hazards broadly in a manner that does not cross the line into interrogation. *See Williams*, 181 F.3d at 954. If an officer wishes to ask specifically about firearms even when there is no reason to suspect they may pose a risk, the government simply cannot use the arrestee's response in its case in chief. Any physical evidence would not be suppressed (and need not be suppressed here), either because it would have been inevitably discovered pursuant to the imminent search, *see United States v. Marrocco*, 578 F.3d 627, 637 (7th Cir. 2009) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)); *see also United States v. Eymann*, 962 F.3d 273, 287-88 (7th Cir. 2020), or because physical

evidence recovered as a result of an otherwise voluntary statement does not implicate the Fifth Amendment, *see Lim*, 897 F.3d at 691.

Excluding the defendant's statement would seem to further the public policy underlying the public safety exception. A suspect is less likely to disclose hazards if his statement is going to be used against him. By excluding the statement, officer safety is fostered by disclosure of potential hazards and the prosecution is, at least, no worse off than if the defendant had remained silent.

In sum, the undisputed facts demonstrate that Vales was subject to custodial interrogation when he was asked if there were any guns or drugs in the apartment. Because the questions were not preceded by *Miranda* warnings, Vales's answer is admissible only if the government shows that an exception to *Miranda* applies. It has failed to do so. Therefore, the court must recommend that Vales's statement that there was a gun in the oven be excluded.

**IT IS THEREFORE ORDERED** that this court's prior order (ECF No. 96) is **vacated** as it relates to Vales's motion to seal (ECF No. 91) and that motion to seal is **denied**. All documents associated with ECF numbers 92 and 93 will be docketed publicly.

**IT IS FURTHER ORDERED** that Vales's motion to seal his reply (ECF No. 103) is **denied**. The documents associated with ECF number 104 will be public.

**IT IS FURTHER ORDERED** that, Vales's reply having been incorrectly docketed as a motion (ECF No. 104), it is terminated for administrative purposes.

**IT IS FURTHER RECOMMENDED** that Vales's motion to suppress (ECF No. 92) be granted with respect to his statement but denied in all other respects.

**IT IS FURTHER ORDERED** that, in accordance with 28 U.S.C. § 636(b)(1)(B) and (C) and Fed. R. Crim. P. 59(b)(2), any written objection to any recommendation herein or part thereof shall be filed within fourteen days of service of this recommendation or prior to the Final Pretrial Conference, whichever is earlier. Failure to timely object waives a party's right to review.

Dated at Milwaukee, Wisconsin this 23rd day of January, 2024.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge